Raymond O. Aghaian (CA Bar No. 218294)
Byron R. Chin (CA Bar No. 259846)
*Pro hac vice applications forthcoming*
KILPATRICK TOWNSEND & STOCKTON LLP
9720 Wilshire Blvd PH
Beverly Hills, CA 90212-2018
Telephone:  (310) 248-3830
Facsimile:  (310) 860-0363
Email: raghaian@kilpatricktownsend.com
        bchin@kilpatricktownsend.com

Jonathan E. Polonsky (NY Bar No. 1892710)
*Pro hac vice application forthcoming*
David V. Mignardi (NJ Bar No. 035052010)
KILPATRICK TOWNSEND & STOCKTON LLP
The Grace Building 1114 Avenue of the Americas
New York, New York USA 10036
Telephone: (215) 775-8786
Facsimile: (212) 214-0341
Email: jpolonsky@kilpatricktownsend.com
        dmignardi@kilpatricktownsend.com

[Additional counsel listed on signature page]
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CRICKET WIRELESS LLC, AT&T MOBILITY LLC, and AT&T Intellectual Property II, L.P.**<br><br>          Plaintiffs,<br><br>v.<br><br>**MAZ WIRELESS, LLC, MOHAMED NAUFERDEEN, DEEN NAUFERDEEN, AND JOHN DOES 1-20**<br><br>          Defendants. | **CASE NO.**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF JURY TRIAL DEMANDED** |

1

## PARTIES

Plaintiffs Cricket Wireless LLC ("Cricket" or "Cricket Wireless"), AT&T Mobility LLC ("AT&T PREPAID") and AT&T Intellectual Property II, L.P. (collectively "AT&T" or "Plaintiffs"), hereby file this Complaint for Damages and Injunctive Relief against Defendants MAZ Wireless, LLC ("MAZ Wireless"), Mohamed Nauferdeen, and Deen Nauferdeen, and John Does 1-20 (collectively "Defendants") and state:

1.      Cricket Wireless LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, Georgia, 30319.

2.      AT&T Mobility LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

3.      AT&T Intellectual Property II, L.P. is a Nevada limited partnership with its principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, Georgia, 30319.

4.      Defendant MAZ Wireless is a New Jersey limited liability company with a registered business address and primary place of business at 125 East Front Street, Plainfield, New Jersey, 07060.

5.      Upon information and belief, Defendant Mohamed Nauferdeen, aka Mohamed Arshard Nauferdeen or Arshard Nauferdeen ("Mohamed Nauferdeen") is an individual who is a resident of New Jersey and who conducts business transactions in this District as alleged herein. Upon information and belief, Mohamed Nauferdeen is a principal of MAZ Wireless.  Upon information and belief, Mohamed Nauferdeen is located at 220 Delmore Avenue, South Plainfield, New Jersey 07080.

6.      Upon information and belief, Defendant Deen Nauferdeen ("Deen Nauferdeen") is an individual who is a resident of New Jersey and who conducts business transactions in this

District as alleged herein.  Upon information and belief, Deen Nauferdeen is a principal of MAZ Wireless.  Upon information and belief, Deen Nauferdeen is located at 220 Delmore Avenue, South Plainfield, New Jersey 07080.

7.      Upon information and belief, Defendants John Does 1-20 are individuals and co-conspirators who participate in other aspects of the Prepaid Phone Trafficking Conspiracy set forth below, including but not limited to purchasing and reselling AT&T Phones, obtaining and supplying unlocking codes, providing phone unlocking services, and/or reselling and shipping AT&T Phones overseas.

## JURISDICTION AND VENUE

8.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because AT&T's claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., and the United States Copyright Act, Title 17 of the United States Code arise under federal law.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over AT&T's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.  This Court also has jurisdiction because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.

9.      Defendant MAZ Wireless is subject to the personal jurisdiction of this Court because it is a New Jersey company with its principal place of business in the State of New Jersey.  The individual Defendants are subject to the personal jurisdiction of this Court because they have conducted, engaged in and carried out business ventures within the State of New Jersey, including trafficking new AT&T Phones, or have committed tortious acts within the State

of New Jersey, and have engaged in substantial and not isolated activity within the State of New Jersey.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## NATURE OF ACTION

11.     AT&T PREPAID™ (f/k/a AT&T GoPhone) sells new prepaid wireless phones and other mobile devices under the AT&T brand.  Cricket Wireless sells new prepaid wireless phones and other mobile devices under the Cricket brand.  These devices (collectively "AT&T Phones" or "Phones") are intended for use with SIM cards from the AT&T Mobility or Cricket Wireless networks (collectively, the "AT&T Authorized Networks"), and are sold at prices lower than the wholesale price of the Phones as sold to AT&T to make them more widely accessible to consumers.  The Phones are physically branded with AT&T's registered trademarks and are preloaded with AT&T proprietary software.  AT&T sells its Phones directly from the AT&T PREPAID and Cricket Wireless websites, through authorized AT&T and Cricket dealers ("Authorized Dealers"), and through AT&T approved national retail chains such as Best Buy, Walmart, or Target ("National Retailers").

12.     Defendants and their co-conspirators are perpetrators of an unlawful conspiracy (the "Conspiracy" or "Prepaid Phone Trafficking Conspiracy") to profit from the illegal acquisition and resale of new bulk AT&T Phones by misappropriating the substantial financial investment that AT&T makes in its Phones, and converting that investment for their own profit and to the detriment of AT&T and its customers.

4

13.     Upon information and belief, the Prepaid Phone Trafficking Conspiracy involves Defendants and their co-conspirators directly or indirectly acquiring new AT&T Phones originally sold at National Retailers and/or at AT&T and Cricket Authorized Dealers. Defendants then offer for sale AT&T Phones that they represent to be new.  As part of this Conspiracy, the Phones, which may be purchased and resold multiple times, are ultimately resold to someone other than the consumer with whom AT&T has a business relationship.  These Phones are not activated on an AT&T Authorized Network.  Instead, a central feature to the Defendants' actions in the Conspiracy involves either circumventing, or causing to circumvent, a technological protection measure to either sell the Phones as already unlocked, or by providing the purchaser with an unlock code specific for each individual AT&T Phone for permanently unlocking the phone.  Once the new Phones are unlocked, they can operate on other carriers' wireless networks.  Upon information and belief, the ultimate users of the Phones may even be located overseas, in a country where the wireless service provider does not subsidize the cost of new phones.

14.     Defendants' Prepaid Phone Trafficking Conspiracy takes advantage of AT&T's investment in its Phones to reduce the costs for its consumers.  Defendants directly or indirectly obtain, and conspire to obtain the new AT&T Phones under false or fraudulent pretenses that they will be utilizing the phones on the AT&T Authorized Networks, but then unlock and resell or divert them to other markets.  The Prepaid Phone Trafficking Conspiracy converts AT&T's investment dollars into substantial profits for Defendants and their co-conspirators.  In addition, Phones resold by Defendants are materially different from AT&T Phones sold through legitimate channels, as they are unlocked, and/or sold without warranty information, original packaging and accessories, and other material.  While Defendants' role in the Conspiracy may not involve each

step of the Conspiracy, each of Defendants' acts is a violation of AT&T's rights and causes

significant damage to AT&T.  Additionally, as participants in the conspiracy, Defendants are

liable for the harm caused to AT&T by the entire Conspiracy.

15.     The Prepaid Phone Trafficking Conspiracy causes tremendous harm to AT&T and

to consumers.  In addition to the pecuniary losses caused by Defendants' conversion of AT&T

Phones, investment in the Phones, lost sales and market expenses, and lost expected customer

revenue, Defendants' misconduct has harmed AT&T's relationships with its customers,

Authorized Dealers, National Retailers, and others.  Defendants' Prepaid Phone Trafficking

Conspiracy also involves unlawfully accessing AT&T's protected computers; trafficking of

AT&T's protected and confidential computer passwords; willful infringement of AT&T's

trademarks; and/or misappropriating AT&T's investment in subsidizing new mobile devices.

AT&T Phones fraudulently acquired and resold under Defendants' Prepaid Phone Trafficking

Conspiracy have caused substantial damage to AT&T's brand, image and reputation.

16.     AT&T seeks to recover damages for the harm caused by Defendants' Prepaid

Phone Trafficking Conspiracy, and to obtain an injunction prohibiting Defendants from

continuing to perpetrate the Prepaid Phone Trafficking Conspiracy.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

I.      **AT&T's Prepaid Phone Business**

17.     AT&T is one of the largest providers of prepaid wireless service in the United

States, and markets its service under the AT&T PREPAID and Cricket marks.  AT&T currently

serves millions of customers nationwide and has developed a highly regarded business reputation

in the public and amongst its customers for deploying innovative technologies and services for

its customers.

18.     AT&T PREPAID and Cricket customers can choose from a variety of prepaid monthly voice and data plans for use on cutting edge devices on the AT&T Mobility or Cricket Wireless networks.  In addition to availability online and over the phone through authorized customer service representatives, AT&T Phones and wireless service are sold through Authorized Dealers and National Retailers across the country.

19.     AT&T's prepaid business model depends on AT&T's ability to deliver high-quality phones at affordable prices.  AT&T sells the Phones for substantially less than what AT&T pays to the manufacturers for the Phones in order to attract legitimate customers of AT&T Phones for use on the AT&T Mobility or Cricket Wireless networks.

20.     AT&T is able to subsidize the cost of the Phones based on expected wireless service revenue.  Except in limited circumstances not applicable here, AT&T Phones must be used on an AT&T Authorized Network for the first six months after activation (the "AT&T Service Period") before they can be legitimately unlocked by AT&T and used on any other network.  Each of the prepaid AT&T Phones are locked to the AT&T Authorized Networks until unlocked.

21.     In addition to subsidizing AT&T Phones, AT&T also offers discounts, rebates, and other incentive programs to its customers, such as discounts for customers who are transferring an existing phone number, or discounts to customers who add additional lines for friends and family on the same account.  Upon information and belief, telecommunications carriers outside the United States do not offer substantial subsidies and investment programs.  Instead, their consumers must pay the full price for the phones to purchase the phone from manufacturers.

22.     AT&T requires its customers to review and agree to Terms and Conditions when using AT&T Phones.  The Terms and Conditions are a valid and binding contract between AT&T and each of its customers.  As set forth below, the packaging for prepaid AT&T Phones provides notice of the Terms and Conditions, directs customers to the full text of the Terms and Conditions, and indicates that by purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the Terms and Conditions.

23.     AT&T's business model in offering its customers Phones at substantially reduced prices is viable only if the Phones are activated and used as intended on an AT&T Authorized Network during the AT&T Service Period.  AT&T requires manufacturers that produce wireless phones for AT&T to install software known as a "SIM Lock" on the AT&T Phones.  This SIM Lock is intended to prevent the Phones from being accessed or used outside the AT&T Authorized Networks during the AT&T Service Period unless AT&T receives a valid request from a legitimate AT&T customer, and unlocks the Phone or provides the customer with an unlock code.

24.     To maintain its standing as a leader in a competitive industry, AT&T expends substantial resources to provide its vast and reliable nationwide wireless network, and to ensure that its customers are able to acquire high-quality phones at affordable prices for use on the AT&T Authorized Networks.  AT&T prepaid phone subsidies and discounts are essential to AT&T's ability to offer affordable, high-quality phones to its customers.  In turn, to be able to offer such subsidies and support its wireless network, AT&T depends on legitimate customers activating and using their Phones on AT&T Authorized Networks during the AT&T Service Period.

## II.   AT&T's Trademarks

25.   AT&T owns federal trademark registrations for the standard character and stylized AT&T®, GOPHONE®, and Cricket® marks for a wide variety of goods and services, including telecommunications services and cellular telephones, as depicted below:

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| **GO PHONE** | Reg. No. 1556587 | 09/19/1989 | Cl. 09: Cellular telephones |
| **GO PHONE** | Reg. No. 2048570 | 04/01/1997 | Cl. 38: Telecommunications services, namely electronic transmission of messages, voice messages, information and data; paging services; electronic audio and/or audiovisual voice messaging services, namely the recording, storage and subsequent transmission of audio and/or audiovisual voice messages in digital format |
| **GOPHONE** | Reg. No. 2911779 | 12/14/2004 | Cl. 38: Telecommunications services, namely electronic transmission of messages, voice messages, information and data; paging services; electronic audio and/or audiovisual voice messaging services, namely the recording, storage and subsequent transmission of audio and/or audiovisual voice messages in digital format |
| **CRICKET** | Reg. No. 2359369 | 06/20/2000 | Cl. 38: Telecommunications services, namely offering personal communications services via wireless networks; and providing cellular telephone services and personal communication network (PCN) services |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| **AT&T** | Reg. No. 3884434 | 11/30/2010 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, 45, including telecommunications services, telephones, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services, |
| **AT&T GOPHONE** | Reg. No. 4049377 | 11/01/2011 | Cl. 38: Telecommunications services, namely wireless transmission, uploading and downloading of voice, data, images, audio, video, signals, software, information, games, ring tones and messages; wireless telephone services; providing wireless calling plans; wireless voice messaging services; wireless text and numeric digital messaging services; wireless roaming services |
| cricket | Reg. No. 4785913 | 08/04/2015 | A wide variety of goods and services in Classes 9 and 38, including mobile phones, smartphones, tablet computers, wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, cell phone accessories, namely cases, cables, holsters, memory cards, car chargers, wall chargers and screen protectors, and telecommunications services, namely wireless telephone services |
|  | Reg. No. 4773093 | 07/14/2015 | A wide variety of goods and services in Classes 9 and 38, including mobile phones, smartphones, tablet computers, wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, cell phone accessories, namely cases, cables, holsters, memory cards, car chargers, wall chargers and screen protectors, and telecommunications services, namely wireless telephone services |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | App. No. 86725288 | 08/14/2015 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, and 45, including telephones, mobile telephones, telecommunications products, hardware for use in wireless communications systems, computer software for use in accessing the global computer network, telephone accessories, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services |
|  | App. No. 86725293 | 08/14/2015 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, and 45, including telephones, mobile telephones, telecommunications products, hardware for use in wireless communications systems, computer software for use in accessing the global computer network, telephone accessories, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services |
|  | App No. 86725298 | 08/14/2015 | A wide variety of goods and services in Classes 8, 9, 10, 11, 12, 14, 16, 18, 21, 24, 25, 28, 36, 37, 38, 41, and 42, including speakerphones, car chargers for cell phones, digital photo and video cameras, cell phone faceplates, hands-free devices and carrying clips for wireless telephones and handheld mobile digital electronic devices for the sending and receiving of telephone calls, protective covers, screens and cases for cell phones, screen protectors for cell phones and computers, subscriber identity module (SIM) cards for cellular telephones |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | App. No. 86725313 | 08/14/2015 | A wide variety of goods and services in Classes 8, 9, 10, 11, 12, 14, 16, 18, 21, 24, 25, 28, 36, and 42, including speakerphones, car chargers for cell phones, digital photo and video cameras, cell phone faceplates, hands-free devices and carrying clips for wireless telephones and handheld mobile digital electronic devices for the sending and receiving of telephone calls, protective covers, screens and cases for cell phones, screen protectors for cell phones and computers, subscriber identity module (SIM) cards for cellular telephones |
|  | App. No. 87878075 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
|  | App. No. 87878227 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | App No. 87878273 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
|  | App. No. 87878290 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |

26.     AT&T owns common law rights in the AT&T PREPAID and Cricket character marks, which have been used in commerce in the United States since at least July 2017 and March 2014 respectively, on and in connection with its telecommunications products and services, including AT&T Phones.  Collectively, AT&T's registered and common law marks are referred to as the "AT&T Marks."

27.     AT&T protects the AT&T Marks, which are the property of AT&T.  The AT&T Marks are an essential and fundamental part of the identity, and goodwill developed by AT&T. AT&T has spent enormous amounts of time, money, and effort advertising and promoting the products and services with which the AT&T Marks are used.  Only AT&T and those it has expressly authorized are permitted to use the AT&T Marks.  The AT&T Marks are valid,

distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with AT&T.

28.     Defendants are not affiliated with AT&T, are not AT&T Authorized Dealers or AT&T approved National Retailers, and are not otherwise expressly or implicitly permitted to use the AT&T Marks.

### III.     **AT&T's Proprietary Software**

29.     AT&T creates and develops proprietary software ("AT&T Software") in conjunction with manufacturers of AT&T Phones, wherein manufacturers develop software applications at AT&T's direction, using AT&T's proprietary intellectual property, design elements, specifications, and requirements.

30.     Copies of the AT&T Software are preinstalled on every AT&T Phone in the phone's firmware, and in the baseband software.  Unlike third-party applications that an end-user downloads from the Internet, the AT&T Software cannot ordinarily be removed from an AT&T Phone by an end-user without unauthorized technical modifications.  Representative examples of such AT&T Software include the myCricket application preinstalled on Cricket Wireless branded Phones, and the myAT&T application preinstalled on AT&T PREPAID branded Phones.

31.     Copies of the AT&T Software on AT&T Phones are never sold to purchasers of AT&T Phones.  Instead, AT&T grants non-exclusive, non-transferable licenses to use the AT&T Software to individual purchasers who accept End User License Agreements ("EULAs"), and/or through the Terms and Conditions referenced in the following section.  Copies of these EULAs are attached as Exhibit 1.  AT&T does not authorize any person who does not accept and comply with the terms of these EULAs to access or otherwise use copies of AT&T Software.

14

**IV.**     **AT&T Prepaid Phone Terms and Conditions**

32.     As set forth above, AT&T Phones are sold under the Cricket and AT&T

PREPAID brands.  Cricket Wireless branded Phones are sold subject to terms and conditions

("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Phones.

A copy of the Cricket Wireless Terms and Conditions of Service ("Cricket Terms") is attached

as Exhibit 2.  These Cricket Terms are set forth in printed inserts that are included in the

packaging with for Cricket Phones sold at National Retailers, and are also available to the public

on the Cricket Wireless website.  They are also referenced in printed warnings that are placed on

the outside of the National Retailer packaging of the Cricket Phones.  The Cricket Terms and

language on the packaging constitute a valid binding contract.

33.     The National Retailer packaging in which new Cricket Phones are sold contains

the following language that is printed on the outside of the package:

> This phone may only be used with Cricket service for the first six
> months after activation.  By purchasing, activating or using this
> phone or Cricket service you acknowledge and agree to the Terms
> and Conditions of Service available inside this package or at
> www.cricketwireless.com, which contains important information,
> including your agreement to dispute resolution by binding
> individual arbitration instead of jury trials or class actions.

34.     Similarly, customers at Cricket Wireless Authorized Dealers are presented with

the Terms and Conditions under which they are receiving service and devices at the time they

activate service and customers must accept those Terms and Conditions before finalizing their

transaction.  Additionally, the Terms and Conditions are included in each Authorized Dealer

device package.

35.     The Cricket Terms included in the Cricket Phone packaging also provide, in

pertinent part, as follows:

You [] agree that you will not make, nor will you assist others to make, any modifications to any Device you purchase from Cricket or programming to enable it to operate on any other system or network except in accordance with our Device Unlocking Policy found at www.cricketwireless.com/legal-info/device-unlock-policy.html. You understand and acknowledge that Devices you purchase from Cricket are sold solely for use with our network and that we will be significantly damaged if you use or assist others to use our Devices for any other purpose.

…

When you purchase, activate or use our Services or any Devices you agree that you will not misuse or abuse our Services or Devices by doing, among other things, any of the following: (a) purchasing a Device without intending to activate or use it on our network; (b) reselling or rebilling our Services, or reselling Devices purchased from Cricket; … [or] (e) using our Services or any Devices for any fraudulent or unlawful purpose[.]

36.     The AT&T PREPAID Phones at issue here are also sold subject to terms and conditions which conspicuously restrict and limit the sale and use of the Phones.  A copy of the AT&T PREPAID Plan Terms and Terms of Service ("AT&T PREPAID Terms") are attached as Exhibit 3.  These AT&T PREPAID Terms are referenced in printed warnings that are placed on the outside of the packaging of every AT&T PREPAID Phone sold at National Retailers and Authorized Dealers, also referenced in a printed Quick Start Guide that is included in the packaging with every AT&T PREPAID Phone, and are also available to the public on AT&T's website.  The AT&T PREPAID Terms constitute a valid binding contract.

37.     The packaging in which new AT&T PREPAID Phones are sold at Authorized Dealers and National Retailers contains the following language that is printed on the outside of the package:

AT&T PREPAID: By activating or using AT&T PREPAID service, you agree to be bound by Terms of Service & Plan Terms available at att.com/prepaidterms. This phone is restricted to AT&T PREPAID service during the first six months after activation and

16

cannot be used with any other carrier's service. Commercial resale
is prohibited except by AT&T's authorized agents or retailers.

38.     The Quick Start Guide included in the AT&T PREPAID  Phone packaging for

National Retailers provides, in pertinent part, as follows:

> AT&T PREPAID service is subject to the terms in the AT&T
> PREPAID Plan Terms & Terms of Service booklet or online at
> att.com/prepaidterms (both, the "Agreement").  By activating and
> using AT&T PREPAID service, you agree to be bound by the
> Agreement.

39.     Similarly, for customers purchasing AT&T PREPAID phones at AT&T

Authorized Dealers, the Terms and Conditions are included in each device package, and after

payment, each customer is provided with a Customer Service Summary document containing a

further reminder of the Terms and Conditions.  A copy of a representative Customer Service

Summary is attached as Exhibit 4.

40.     The AT&T PREPAID Terms provide, in pertinent part, as follows:

> Devices designed for use only on AT&T's network ("Equipment")
> may not function on other wireless networks.  Equipment is sold
> exclusively for use with AT&T PREPAID service and may not be
> resold.  By purchasing such Equipment you agree to activate and use
> it on AT&T PREPAID service.  You also agree that you will not
> make, nor will you assist others to make, any modifications to the
> Equipment or programming to enable the Equipment to operate on
> any other system.  AT&T may, at its sole and absolute discretion,
> modify the programming to enable the operation of the Equipment
> on other systems.  You understand and acknowledge that the
> Equipment is sold solely for use with AT&T's prepaid service and
> that AT&T will be significantly damaged if you use or assist others
> to use the Equipment for any other purpose.  You agree not to take
> any action to circumvent limits on the quantity of Equipment that
> may be purchased.  You will be liable to AT&T for any damages
> resulting from the conduct prohibited in this section.

41.     The restrictions and limitations in the Cricket Terms and AT&T PREPAID Terms

and on National Retailer packaging are intended to restrict the use of AT&T and Cricket Phones

solely to the AT&T Mobility and Cricket Wireless networks during the AT&T Service Period.

42.     AT&T Phones may access the AT&T Mobility or Cricket Wireless Service only within the United States on all plans, and some plans also include access to roaming networks in Mexico and Canada (the "Coverage Area") during the AT&T Service Period.

43.     During the AT&T Service Period, AT&T PREPAID and Cricket Phones are not authorized to or capable of accessing any cellular network other than the AT&T Mobility or Cricket Wireless networks, respectively, or third party wireless carrier networks with which AT&T has roaming agreements.  AT&T Phones are programmed with a technological protection mechanism known as a "SIM Lock," which checks whether the inserted SIM card contains an approved network configuration.  If the SIM card does not contain an approved network configuration, the SIM Lock causes the phone to display a prompt to enter an unlock code.  The SIM Lock prevents use of the phone on a network other than the AT&T Mobility or Cricket Wireless networks, and also prevents access to the AT&T Software until the correct unlock code is entered.  As set forth in Cricket's Wireless Device Unlock Policy ("Unlock Policy"), AT&T will only provide an unlock code to a customer if the Cricket Wireless Phone: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, 3) is designed for use and is locked to the Cricket network, and 4) has been active on the Cricket Wireless network for at least the six-month term of the Cricket Service Period.  A copy of the Cricket Unlock Policy is attached as Exhibit 5.  AT&T PREPAID Phones are subject to the following requirements under the AT&T PREPAID Unlock Policy, a copy of which is attached as Exhibit 6.  As set forth in the AT&T PREPAID Unlock Policy, AT&T will only provide an unlock code to a customer if the device: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, and 3) has been active on the AT&T Mobility network for at least the six-month term of the AT&T Service Period.

V.     **Defendants' Misconduct**

44.     AT&T has discovered that large quantities of its Phones sold at Authorized

Dealers and National Retailers are not activated for use on the AT&T Mobility or Cricket

Wireless networks.  Defendants and their co-conspirators are fraudulently acquiring, or causing

to be acquired, and reselling new AT&T Phones in bulk quantities.  Defendants, either directly or

through their co-conspirators, acquire the Phones under false or fraudulent pretenses, such as

purchasing the Phones from AT&T Authorized Dealers or National Retailers ostensibly for

activation and use on an AT&T Authorized Network.  AT&T Phones acquired by Defendants

and their co-conspirators are in fact not activated on an AT&T Authorized Network.  Instead,

Defendants and their co-conspirators either unlock the Phones, or obtain the unlock codes, so

that they can be used on other carriers' wireless networks, and then resell the Phones for a

substantial profit.  On information and belief, some of the Phones are ultimately shipped

overseas.  Unlocked Phones can be used on any network in the United States or foreign carriers,

and as a result, Defendants are able to sell unlocked phones for a higher price than locked phones

sold by AT&T and its Authorized Dealers.

45.     Once an AT&T Phone is unlocked for use with another carrier in the United

States and/or shipped overseas to be used on other wireless networks, AT&T no longer has a

revenue source to recoup its investment on that Phone.

46.     The process of unauthorized unlocking of AT&T Phones involves bypassing the

SIM lock installed in the Phones, circumventing the electronic protections installed in the phone,

which then allows the user of an unlocked phone to access and/or use the AT&T Software under

conditions not authorized by AT&T.

19

47.     From a casual consumer's perspective, an unlocked AT&T Phone may look physically identical to an unaltered AT&T Phone.  The unlocked Phone is labeled with the same AT&T Marks as new AT&T Phones.  In addition, an unlocked AT&T Phone continues to display AT&T Marks on its screen when it is powered on.

48.     AT&T licenses, but does not sell, the copies of AT&T Software loaded onto AT&T Phones to end users.  Thus, Defendants do not lawfully own any copies of the AT&T Software.  The sole purpose for Defendants' Prepaid Phone Trafficking Conspiracy is for profiting at AT&T's expense and misappropriating AT&T's financial investment in the Phones.

49.     An agreement and conspiracy existed and continues to exist between and among each of the Defendants and their co-conspirators to unlawfully engage in the bulk purchase, trafficking and resale of unlawfully unlocked AT&T Phones under the AT&T Marks.  While the full extent of Defendant's activities in the Prepaid Phone Trafficking Conspiracy is not yet known, Defendants have at least conspired and worked in concert with other individuals to acquire AT&T Phones originally sold at Authorized Dealers or National Retailers, to unlock AT&T Phones and/or to traffic in codes for unlocking AT&T Phones, and to resell the unlocked AT&T Phones to others.

50.     Defendants knowingly agreed to engage, and did engage in one or more overt acts in furtherance of the conspiracy as set forth with more particularity in this Complaint.

51.     AT&T has been proximately damaged by the conspiracy and by Defendants' actions in furtherance of the conspiracy.

52.     As set forth above, Defendants are neither AT&T Authorized Dealers or AT&T approved National Retailers.  Defendants have no legitimate connection to AT&T.

53.     On December 19, 2017, AT&T's undercover investigators observed an individual named Wan Ho Be at a Cricket Wireless store located at 130 East Black Horse Pike Suite 316, Audubon, New Jersey, wherein he purchased 20 Cricket devices under numerous account names. Mr. Be entered and exited the Cricket store several times, carrying numerous Cricket-branded shopping bags that contained cellular phones to his vehicle.  AT&T's investigators then continued to observe Wan Ho Be until he met with Defendant Mohamed Nauferdeen in a McDonald's parking lot at 316 Durham Avenue, South Plainfield, New Jersey.  Mohamed Nauferdeen entered Mr. Be's vehicle, and exited with a large green trash bag, which he placed in his own vehicle before departing.

54.     On December 27, 2017, AT&T's undercover investigators observed Defendant Mohamed Nauferdeen carrying large plastic bags from his vehicle into the MAZ Wireless store facility in Plainfield, New Jersey.  The investigators entered the store, and observed several AT&T Phones for sale in display cases, and a sign which read "Choose from the latest unlocked GSM phones or Smartphones."  Later that day, investigators observed Mohamed Nauferdeen taking numerous boxes from the MAZ Wireless store and placing them in his vehicle. Investigators then observed Mohamed Nauferdeen meeting with another individual in a parking lot in Iselin, New Jersey, where Mohamed Nauferdeen provided the boxes from the MAZ Wireless store to the individual, and in exchange received numerous white "MetroPCS" devices in retail packaging.  Mohamed Nauferdeen then returned to the MAZ Wireless store.

55.     On February 15, 2018, AT&T's undercover investigators entered the MAZ Wireless store and spoke with Defendant Mohamed Nauferdeen, who informed the investigators that he could sell them a large quantity of several models of prepaid phones, and provided them

with a list of available models.  Mohamed Nauferdeen advised the investigators that he generally required a minimum purchase of 20 handsets per wholesale transaction.

56.     On March 2, 2018, Mohamed Nauferdeen informed AT&T's investigators by text message that he had large quantities of phones available, including the ZTE Maven 3, an AT&T PREPAID-branded Phone.  On March 6, 2018, Mohamed Nauferdeen informed investigators via text message that he had 20 new, unlocked ZTE Maven 3 devices available for $80 each.

57.     On March 20, 2018, Mohamed Nauferdeen informed AT&T's investigators via text message that he was in possession of 10 new, unlocked Samsung AMP Prime devices, a Cricket-branded Phone, at a price of $140 each.  On March 22, 2018, AT&T's investigators agreed to purchase the Samsung AMP Prime phones.

58.     On March 23, 2018, AT&T's investigators visited the MAZ Wireless store, where they met with Defendants Mohamed Nauferdeen and Deen Nauferdeen.  Upon their arrival, AT&T's investigators observed Mohamed Nauferdeen with a Samsung AMP Prime Phone out of its packaging.  Mohamed Nauferdeen was observed opening the phone with a tool and in the course of doing so informed investigators that he was in the process of unlocking the phone. When the investigators requested confirmation that the phones were unlocked, and provided an activated T-Mobile SIM card, Mohamed Nauferdeen placed the SIM card into the phone he had just unlocked, and demonstrated that when powered on, it connected to the T-Mobile network. AT&T's investigators paid for the Samsung AMP Prime devices with a cash payment they provided to Deen Nauferdeen in the store, and received an email invoice from Mohamed Nauferdeen.  Mohamed Nauferdeen provided the phones to AT&T's investigators in their original packaging.

59.     During this interaction, when AT&T's investigators stated they needed the devices unlocked to send to Colombia, Mohamed Nauferdeen stated that he exported phones worldwide, including to Dubai and Brazil.  Mohamed Nauferdeen further represented that he could sell 300 devices to investigators with advance notice, and that he would require a deposit for orders larger than 100 phones.  Mohamed Nauferdeen further represented that MAZ Wireless stored phones in a warehouse in New York, and that Deen Nauferdeen was also aware of MAZ Wireless's business operations.

60.     On March 26, 2018, Mohamed Nauferdeen contacted AT&T's investigators by telephone and informed them he had several models of Cricket-branded Phones in stock in large quantities.  On March 27, 2018 Mohamed Nauferdeen agreed to sell 20 new LG Fortune Cricket-branded Phones to investigators for $90 each.  Mohamed Nauferdeen told the investigators that he could unlock the phones or provide unlock codes. The investigators requested that he provide the unlock codes.

61.     On March 28, 2018, AT&T's investigators visited the MAZ Wireless store to purchase the phones, meeting with Deen Nauferdeen, who had the 20 LG Fortune Phones ready. AT&T's investigators received the phones new, locked, and in their original packaging, and paid MAZ Wireless for them in cash.  AT&T's investigators received the unlock codes for the 20 LG Fortune Phones from Mohamed Nauferdeen via email while still in the store.  Deen Nauferdeen told investigators that MAZ Wireless typically purchased hundreds of unlocking codes per transaction from a person in California, and reiterated that MAZ Wireless had numerous clients in India, China, and in New York that made bulk purchases of phones.  Deen Nauferdeen further represented that if the investigators obtained stolen Samsung phones, MAZ Wireless would unlock the devices and "clean them and fix them nice."

62.     Later the same day, Mohamed Nauferdeen called AT&T's investigators and represented that he could get any phone, and any quantity they requested on short notice.

**VI.     Substantial Harm Caused by Defendants' Misconduct**

63.     Defendants' actions significantly harm AT&T in numerous ways, including *inter alia*: (1) AT&T is unable to recoup its substantial investment in subsidizing AT&T Phones; (2) AT&T is deprived of the opportunity to earn profits by providing wireless service to legitimate AT&T consumers during the AT&T Service Period; (3) Defendants' infringement of the AT&T Marks causes significant ongoing and irreparable losses and harm to AT&T's brand, image, and reputation;  Defendants' actions seriously and irreparably interfere with AT&T's relationships with its Authorized Dealers, National Retailers, and customers.  All of these factors undermine AT&T's competitive edge in the cellular phone industry.

64.     In addition, when AT&T Phones are unlocked and resold by Defendants or their co-conspirators, AT&T is also harmed because it is no longer able to control the quality of its product, and because the process of unlocking and reselling an AT&T Phone may void the manufacturer's warranty on the device.  AT&T assists consumers with manufacturer warranty service by offering an expedited warranty exchange program.  Because AT&T coordinates manufacturer warranty service requests for consumers and invests considerable resources in its warranty exchange program, both consumers and AT&T may be harmed when an AT&T Phone that has been altered or sold by Defendants or their co-conspirators is submitted to AT&T or the manufacturer for warranty repair.  AT&T incurs expenses in providing shipping and return services to consumers who attempt to obtain warranty service for AT&T Phones through AT&T's warranty exchange program, and in inspecting AT&T Phones that are out of warranty.  Moreover, even if a manufacturer provides warranty service to a consumer with an unlawfully

resold AT&T Phone that should not qualify for warranty service, AT&T still suffers harm because the manufacturers of AT&T Phones build the cost of warranty repairs into the price that AT&T pays for each AT&T Phone.  Therefore, providing warranty service to ineligible devices harms AT&T by increasing the costs it must pay for each AT&T Phone.  Finally, consumers who purchase AT&T Phones from Defendants without realizing they have been unlawfully unlocked and resold may turn to AT&T for warranty service in reliance on the AT&T Marks on the Phones, but be unable to obtain warranty service.

65.     AT&T has also suffered harm from the significant time and effort, and the associated cost it has spent remedying Defendants' fraudulent actions within the AT&T system and supply chain.

**VII.    Phone Trafficking is Unlawful**

66.     The unlawfulness of the conduct involved in the Prepaid Phone Trafficking Conspiracy is widely recognized and acknowledged.

67.     Other wireless providers such as MetroPCS, Sprint Solutions Inc., T-Mobile USA, Inc., and TracFone Wireless, Inc., have filed multiple lawsuits in numerous federal courts across the country against other bulk phone traffickers.  Each of those entities has succeeded in obtaining Final Judgments and Permanent Injunctions, and in enforcing Permanent Injunctions where needed.

68.     Similarly, although the Unlocking Consumer Choice and Wireless Competition Act, Pub. L. 113-144 ("Unlocking Act") of 2014 allows the individual owner of a cellular phone to unlock their phone solely for the legitimate purpose of connecting to a wireless network, the legislative history makes clear that the Unlocking Act was not intended to authorize prepaid

wireless phone trafficking such as the Prepaid Phone Trafficking Conspiracy.  Indeed, the July

17, 2014 Senate Report, S. Rep. 113-212, states (emphases added):

> Neither of the methods for unlocking recognized by the legislation excuses owners from compliance with applicable service agreements they may have with the wireless carriers that service their phones.  Such agreements may, for example, require fulfillment of an applicable postpaid service contract, device financing plan, or payment of an applicable early termination fee.  Moreover, *nothing in the bill permits third parties to unlock devices independently of the device owner's direction, or for a purpose other than allowing the owner or a family member to connect to a new wireless network*. As the Librarian of Congress explained with respect to the scope of permissible commercial activity under the 2010 determination that is reinstated by the bill, '*the designation of this class will not benefit those who engage in the type of commercial activity that is at the heart of the objections of opponents of the proposed class: the 'bulk resellers' who purchase new mobile phone handsets at subsidized prices and, without actually using them on the networks of the carriers who market those handsets, resell them for profit.*'"

69.    Likewise, in the subsequent October 2015 Section 1201 Rulemaking: Sixth

Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, the Register

of Copyrights specifically noted that "there is also an unlawful form of large-scale unlocking that

involves the bulk purchase of unused handsets that have been offered for sale at subsidized

prices by prepaid wireless carriers, and then unlocking and reselling those handsets for a profit."

The Register also noted that "there was universal agreement that any exemption for cellphones

should be fashioned so as to exclude trafficking activities that seek illegitimately to profit from

subsidies offered by prepaid phone providers."  The Register further noted that past exemptions

for unlocking were also "designed to prevent the 'illegal trafficking of mobile phones.'"  Thus,

the Register recommended that lawful unlocking under the Unlocking Act be limited to "used"

devices, namely, devices that "ha[ve] been lawfully acquired and activated on the wireless

telecommunications network of a carrier."

26

70.     Courts have also consistently held that any modern cellular phone containing an electronic processor to be a computer which is subject to protection against unauthorized access under the Computer Fraud and Abuse Act ("CFAA").  Likewise, Courts have held that unlocking of phone software, and use of proprietary codes to gain access to locked phones can form the basis for a CFAA claim.

## COUNT ONE

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114 [§ 32(1) of the Lanham Act]

71.     AT&T reasserts the allegations set forth in Paragraphs 1 through 70 above and Exhibits 1 through 6 as though fully set forth herein.

72.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered AT&T Marks without authorization in connection with their conspiracy to sell and offer for sale of unlocked, materially altered AT&T Phones, which downstream customers will discover have been altered from their original state and may not include the warranties applicable to new, unaltered AT&T Phones.

73.     Defendants' and/or their co-conspirators' use of federally-registered AT&T Marks in connection with the sale of AT&T Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between AT&T and Defendants.

74.     Defendants' and/or their co-conspirators' unauthorized use of certain federally registered AT&T Marks in connection with their participation in the Conspiracy is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of AT&T.

27

75.     Defendants' and/or their co-conspirators' use of certain federally-registered AT&T Marks in connection with the unlocked, materially different AT&T Phones, which may not include the warranties applicable to new, unaltered AT&T Phones, constitutes a misappropriation of AT&T distinguishing and identifying federally-registered trademarks that were created as a result of significant effort and expense by AT&T over a long period of time.

76.     Defendants' and/or their co-conspirators' use of federally-registered AT&T Marks constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with AT&T, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by AT&T.

77.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, AT&T and the reputation and goodwill of AT&T, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of AT&T.

78.     AT&T is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

79.     Defendants' aforesaid acts constitute willful infringement of AT&T's aforementioned federally registered trademarks in violation of 15 U.S.C. §1114.

## COUNT TWO

### FEDERAL COMMON LAW TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN
### 15 U.S.C. § 1125 (a)(1)(A) [§ 43(a) of the Lanham Act]

80.     AT&T reasserts the allegations set forth in Paragraphs 1 through 79 above and Exhibits 1 through 6 as though fully set forth herein.

28

81.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the AT&T Marks without authorization in connection with their conspiracy to sell and offer for sale of unlocked, materially different AT&T Phones, which downstream customers will discover have been altered from their original state, and may not include the warranties applicable to new, unaltered AT&T Phones.

82.     Defendants' and/or their co-conspirators' use of at least one of the AT&T Marks in connection with the sale of unlocked, materially different AT&T Phones has caused, and will further cause, a likelihood of confusion, and mistake and deception as to the source of origin of Defendants' materially altered products.

83.     Defendants' and/or their co-conspirators' unauthorized use of at least one of the AT&T Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of AT&T.

84.     Defendants' and/or their co-conspirators' use of at least one of the AT&T Marks in connection with the unlocked, materially different AT&T Phones, which may not include the warranties applicable to new, unaltered AT&T Phones, constitutes a misappropriation of at least one of the distinguishing and identifying AT&T Marks that was created as a result of significant effort and expense.

85.     Defendants' and/or their co-conspirators' use of at least one of the AT&T Marks constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with AT&T, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by AT&T.  Defendants are not affiliated with AT&T in any way.

86.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, AT&T and the reputation and goodwill of AT&T, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of AT&T.

87.     AT&T is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

88.     Defendants' activities constitute false designation of origin and false descriptions and representations in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

89.     AT&T is entitled to appropriate relief as prayed for hereinafter, including preliminary and permanent injunctive relief.

90.     Defendants knew or should have known that Plaintiffs are the owners and/or authorized licensees of the AT&T Marks and that Defendants had no legal right to use any of the AT&T Marks on their infringing products.

91.     Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiffs' lost profits, Defendants' profits, and Plaintiffs' attorneys' fees.

## COUNT THREE

## CONTRIBUTORY TRADEMARK INFRINGEMENT

92.     AT&T reasserts the allegations set forth in Paragraphs 1 through 91 above and Exhibits 1 through 6 as though fully set forth herein.

93.     Defendants knew that their customers intended to resell unlocked AT&T Phones. Defendants also offered their services to customers in unlocking stolen AT&T Phones for resale

to the general public as new AT&T Phones.  By misappropriating and using at least one of the AT&T Marks in connection with the Prepaid Phone Trafficking Conspiracy, Defendants knowingly aided and enabled resellers of their products to market them to members of the general public in a way that infringes at least one of the AT&T Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

94.      Defendants' unlawful, unauthorized, and unlicensed sale of the unlocked AT&T Phones has contributed to the creation of express and implied misrepresentations that the AT&T Phones, as sold by Defendants, were created, authorized or approved by AT&T, and include the warranties applicable to new, unaltered AT&T Phones.  Unlocked AT&T Phones sold by Defendant are materially altered and different from AT&T Phones sold directly by AT&T and AT&T Authorized Dealers.

95.      Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase AT&T Phones altered by Defendants to believe that they are purchasing wireless phones approved by AT&T that qualify for their original warranties.

96.      Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

97.      AT&T has been damaged and continues to suffer damages as a result of Defendants' actions.

98.      There is no adequate remedy at law to fully compensate AT&T for the harm caused by Defendants' actions.

## COUNT FOUR

### UNFAIR COMPETITION
### N.J. Rev. Stat. § 56:4-1

99.     AT&T reasserts the allegations set forth in Paragraphs 1 through 98 above and Exhibits 1 through 6 as though fully set forth herein.

100.    Defendants have and are engaged in fraudulent acts or practices in violation of the prohibition against deceptive acts and practices found at N.J. Rev. Stat. § 56:4-1.

101.    Defendants have used and are using the AT&T Marks in connection with the above-described Prepaid Phone Trafficking Conspiracy in such a manner as to misrepresent the source, sponsorship, approval, and/or certification of their products and services.

102.    The use of the AT&T Marks by Defendants creates an unreasonable risk that present and potential consumers may falsely conclude that there exists some affiliation, connection, or association between and among AT&T and Defendants.

103.    Defendants' acts have damaged, impaired, and diluted that part of AT&T's goodwill and good name symbolized by the AT&T Marks.  The nature, probable tendency, and effect of Defendants' use of these names and properties in the manner alleged are to enable Defendants to deceive the public.

104.    Defendants' use of AT&T's name and Marks in its Prepaid Phone Trafficking Conspiracy constitutes unfair competition as prohibited by N.J. Rev. Stat. § 56:4-1.

105.    Defendants had actual knowledge of AT&T's rights at the time they used the AT&T Marks in connection with their Prepaid Phone Trafficking Conspiracy.  Thus, Defendants willfully and deliberately infringed upon AT&T's rights.

106.     Defendants' unfair business practices are of a recurring nature and harmful to the consumers and the public at large, as well as AT&T.  These practices constitute unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising.

107.     As a result of Defendants' acts, AT&T has suffered and continues to suffer and incur irreparable injury, loss of reputation, and pecuniary damages in excess of $75,000.  Unless enjoined by this Court, Defendants will continue these acts, thereby causing AT&T further immediate and irreparable damage.  An award of injunctive relief would provide a benefit to Plaintiffs and a detriment to Defendants in excess of $75,000.

**COUNT FIVE**

**UNFAIR COMPETITION**

108.     AT&T reasserts the allegations set forth in Paragraphs 1 through 107 above and Exhibits 1 through 6 as though fully set forth herein.

109.     Defendants' conduct, directly or through their co-conspirators in acquiring the Phones, unlocking the Phones or providing unlocking codes for the Phones, and reselling the Phones as new for activation on other wireless networks constitutes unfair competition under the common law of the State of New Jersey.

110.     Defendants' conduct reselling, and/or inducing others to resell unlocked AT&T Phones undermines AT&T's subsidized incentive programs, constitutes unfair competition under the common law of the State of New Jersey.

111.     Defendants' use of at least one of the AT&T Marks in connection with the sale of unlocked, materially altered AT&T Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially altered products and services, and the relationship between AT&T and Defendants.  Thus, Defendants

have also engaged in unfair competition with AT&T in violation of the common law of the State

of New Jersey by selling and/or offering, and promoting their products with the intention of

trading upon the goodwill established by AT&T and are thereby misappropriating the benefits of

substantial effort and money expended by AT&T in establishing its rights in and to the AT&T

Marks.

112.    Defendants' actions were done in bad faith, were intentional, malicious, and

willful, and have caused substantial harm to AT&T.

113.    AT&T is entitled to appropriate relief, including injunctive relief.  An award of

injunctive relief would provide a benefit to AT&T and a detriment to Defendants in excess of

$75,000.

## COUNT SIX

### COMMON LAW FRAUD
### AND FRAUDULENT MISREPRESENTATION

114.    AT&T reasserts the allegations set forth in Paragraphs 1 through 113 above and

Exhibits 1 through 6 as though fully set forth herein.

115.    As part of the Conspiracy, each of the Defendants, directly or indirectly through

other co-conspirators, knowingly and systematically misrepresent to AT&T, Authorized Dealers,

and National Retailers that the Phones are being acquired for a legitimate purpose, that the

Phones will be used by Defendants or other legitimate consumers on AT&T Authorized

Networks, and that they will perform in accordance with the Terms and Conditions.  Moreover,

each of the Defendants, directly or indirectly through other co-conspirators, purposefully and

knowingly concealed from AT&T, Authorized Dealers, and National Retailers that the Phones

are being acquired for an illegitimate purpose and that Defendants and their co-conspirators

intend to cause or permit the Phones to be sold in the manner described herein so as to avoid the

Terms and Conditions pursuant to which the Phones are sold.  At the time Defendants acquired

the AT&T Phones, they were aware that the Phones were acquired for unlocking and resale, that

the Phones were intended to be used on a network other than Cricket Wireless or AT&T

Mobility before the end of the AT&T Service Period and that they would not perform in

accordance with the Terms and Conditions.  Defendants acquired the Phones, or otherwise

caused the Phones to be acquired, with the specific intent of unlocking and reselling the Phones

and facilitating the use of the Phones on networks other than AT&T.

116.    On information and belief, each Defendant, directly or indirectly through other

co-conspirators, participated in defrauding AT&T, its legitimate customers, Authorized Dealers,

and National Retailers, to acquire new AT&T Phones, including the specific models identified

herein, for unlocking, resale, and even for shipping overseas.

117.    When Defendants, directly or through their co-conspirators, acquire AT&T

Phones as part of the Conspiracy, they do not intend to use the Phones for a legitimate purpose or

to activate them or maintain them as active on AT&T Authorized Networks, or otherwise

perform in accordance with the Terms and Conditions.

118.    Defendants and their co-conspirators know that they are required to activate the

AT&T Phones for use on an AT&T Authorized Network, pay the monthly service charges, and

otherwise comply with the Terms and Conditions.

119.    Defendants intend for AT&T to rely on their misrepresentations and

concealments, and/or the misrepresentations and concealments of their co-conspirators, to allow

Defendants to acquire and unlock the Phones for improper purposes, including reselling AT&T

Phones for use overseas, or on wireless networks other than the AT&T Authorized Networks in

the United States before the end of the AT&T Service Period.  Defendants specifically facilitated

this fraudulent conspiracy by unlawfully unlocking, or otherwise causing the unlawful unlocking

of the Phones, and thereafter resold the unlawfully unlocked Phones in bulk for a profit without

any authorization from AT&T.

120.    AT&T relied on these material misrepresentations in allowing the sale of AT&T

Phones for what it believed was a legitimate purpose.  Had AT&T known the truth about

Defendants' intentions with respect to the Phones, it would not have sold or permitted the Phones

to be sold to Defendants and their coconspirators.  AT&T's reliance on the misrepresentations

and concealments of Defendants and their co-conspirators was reasonable under the

circumstances.

121.    AT&T has been damaged in excess of $75,000 and continues to suffer damages as

a result of Defendants' actions.

122.    Defendants' conduct was intentional, malicious, and willful, such that an award of

punitive damages is appropriate.

### COUNT SEVEN

### CONSPIRACY TO COMMIT FRAUD
### AND FRAUDULENT MISREPRESENTATION

123.    AT&T reasserts the allegations set forth in Paragraphs 1 through 122 above,

Exhibits 1 through 6, and Paragraphs 128 through 244 below as though fully set forth herein.

124.    An agreement and conspiracy existed and continues to exist between and among

the Defendants and other co-conspirators to unlawfully acquire in bulk, traffic, and resell

unlawfully unlocked and altered AT&T Phones under at least one of the AT&T Marks, which

results in federal common law and statutory trademark infringement, common law unfair

competition, contributory trademark infringement, tortious interference with business existing

and prospective relationships and existing contracts, unjust enrichment, and violations of the

Computer Fraud and Abuse Act, among other things.

125.    Each Defendant knowingly agreed to engage, and did engage, in one or more

overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.  As

part of the Conspiracy, each of the Defendants, directly or indirectly through other co-

conspirators, regularly and systematically misrepresent to AT&T, Authorized Dealers, and

National Retailers that the Phones are being acquired for a legitimate purpose, that the Phones

will be used by Defendants or other legitimate consumers on AT&T Authorized Networks, and

that they will perform in accordance with the Terms and Conditions.

126.    AT&T has been proximately damaged in excess of $75,000 by the conspiracy and

Defendants' actions in furtherance thereof.

127.    Defendants' conduct was intentional, malicious, and willful, such that an award of

punitive damages is appropriate.

## COUNT EIGHT

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

128.    AT&T reasserts the allegations set forth in Paragraphs 1 through 127 above and

Exhibits 1 through 6 as though fully set forth herein.

129.    AT&T Phones are "protected computers" as that term is defined in 18 U.S.C. §

1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate

commerce and communications.

130.    Defendants and their co-conspirators are knowingly trafficking in unlocking

code/passwords that effectively control access to AT&T Software and use of the AT&T Phone

by offering to the public its alteration service and unauthorized access to the Phone and software for a fee.

131.    Through the Conspiracy, Defendants are knowingly trafficking in the confidential access codes/passwords with the intent to defraud and harm AT&T by facilitating unauthorized unlocking of AT&T Phones as part of the Prepaid Phone Trafficking Conspiracy.

132.    Defendants' transfer of the Phones and confidential unlocking codes/passwords to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029(e)(5) in that the unlocking codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the unlocking codes/passwords with intent to transfer or dispose of them.

133.    Defendants' trafficking of the Phones substantially affects interstate commerce and communication in that the unlocking codes/passwords are trafficked over the internet, throughout the United States, and around the world, and AT&T Phones are used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

134.    Defendants' trafficking of AT&T's unlocking codes/passwords has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one year period.

135.    With respect to loss, AT&T has spent well in excess of $5,000 over a one-year period assessing the damage to AT&T Phones and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

136.    Also with respect to loss, AT&T has spent well in excess of $5,000 over a one year period investigating Defendants' trafficking of unlocking codes/passwords, as well as tracking down fraudulently sold AT&T Phones.

137.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants access protected computers without authorization.

138.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

139.    Defendants' conduct is intentional, malicious and willful.

140.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

**COUNT NINE**

**UNAUTHORIZED ACCESS**
**18 U.S.C. § 1030(a)(5)(C)**

141.    AT&T reasserts the allegations set forth in Paragraphs 1 through 140 above and Exhibits 1 through 6 as though fully set forth herein.

142.    The manufacturers that produce wireless phones for AT&T install proprietary and confidential software on the AT&T Phones to lock the Phones to AT&T's Authorized Networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks.  Except in limited circumstances not applicable here, AT&T does not authorize

unlocking of AT&T Phones during the AT&T Service Period, and has the SIM Lock installed on AT&T Phones to prevent unauthorized access to the proprietary AT&T Software and unauthorized use of the AT&T Phone.  Inputting the unlawfully obtained unlocking code of an AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

143.    AT&T Phones are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

144.    In furtherance of their Conspiracy, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire Phones from AT&T and in so doing void any purchase agreement and any legitimate access to the software and passwords on the AT&T Phones.  As such, Defendants' access to the Phones is not authorized in any way.

145.    Defendants unlawfully access, or otherwise facilitate access, to AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on wireless networks other than AT&T Authorized Networks.  Defendants' entry of unlocking codes/passwords into AT&T Phones provides unauthorized access to proprietary AT&T Software and the AT&T Phone by circumventing the SIM Lock.

146.    Defendants' illegal and unauthorized access of AT&T Phones allows them to improperly misappropriate AT&T's investment in its Phones.

147.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States,

and around the world, and used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

148.     Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T Phones has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

149.     With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.

150.     Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed protected AT&T Phones without authorization.

151.     With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

152.     Defendants' activities in accessing, or otherwise facilitating access to AT&T Phones without authorization and accessing the proprietary AT&T Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

153.     Defendants' conduct is intentional, malicious and willful.

41

154.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

### COUNT TEN

**UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD**
**18 U.S.C. § 1030(a)(4)**

155.    AT&T reasserts the allegations set forth in Paragraphs 1 through 154 above and Exhibits 1 through 6 as though fully set forth herein.

156.    The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to lock the Phones to AT&T's protected computer networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period, except in specific circumstances not applicable here. Inputting the unlawfully obtained unlocking code of a AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

157.    AT&T Phones are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

158.    Defendants unlawfully access, or otherwise facilitate access to, AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary software that is installed in

AT&T Phones so that the AT&T Phone will operate on other wireless networks.  Defendants'
entry of unlocking codes/passwords into AT&T Phones, provides unauthorized access to
proprietary AT&T Software.

159.    Defendants are knowingly, intentionally, and with the intent to defraud,
facilitating the unauthorized access of AT&T Phones.

160.    Defendants' access, or otherwise facilitation of access, of the AT&T Phones
allows them to improperly steal AT&T's substantial financial investment in its Phones.

161.    Defendants' activities substantially affect interstate commerce and
communication in that the Phones are trafficked over the internet, throughout the United States,
and around the world, are used in and affect interstate commerce and communication, and use
wireless telecommunications service pursuant to licenses issued by the Federal Communications
Commission.

162.    Defendants' unauthorized access, or otherwise facilitation of access, of AT&T
Phones has caused and will continue to cause AT&T to suffer injury, with "damages" and
"losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively –
substantially in excess of $5,000 over a one-year period.

163.    Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T
Phones has caused and will continue to cause AT&T to suffer injury, with "damages" and
"losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively –
substantially in excess of $5,000 over a one-year period.

164.    With respect to loss, AT&T has lost its investments in the stolen Phones with the
codes/passwords and spent well in excess of $5,000 taking remedial action to counteract
Defendants' unauthorized access, and conducting a damage assessment regarding Defendants'

collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.

165.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed protected AT&T Phones without authorization.

166.    With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

167.    Defendants' activities in accessing, or otherwise facilitating access to, AT&T Phones without authorization and accessing the proprietary AT&T Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

168.    Defendants' conduct is intentional, fraudulent, malicious and willful.

169.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT ELEVEN

### OBTAINING INFORMATION FROM A PROTECTED COMPUTER
### 18 U.S.C. § 1030(a)(2)(C)

170.    AT&T reasserts the allegations set forth in Paragraphs 1 through 169 above and Exhibits 1 through 6 as though fully set forth herein.

44

171.    AT&T Phones are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

172.    The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to lock the Phones to AT&T's protected computer networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period.  Inputting the unlawfully obtained unlocking code of an AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

173.    Defendants unlawfully access, or otherwise facilitate access to AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on other wireless networks.

174.    Defendants use, or otherwise facilitate others to use unlocking codes/passwords to unlock, and thereby obtain unauthorized access to AT&T Phones.  Such unauthorized access therefore allows Defendants or others whom Defendants have assisted to obtain information from a protected computer.

175.    Defendants' unauthorized access, or facilitation thereof, and obtaining of information has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one year period.

176.     With respect to loss, AT&T has spent well in excess of $5,000 over a one-year period assessing unlocked AT&T Phones for damage to prevent future unauthorized access by Defendants and/or their co-conspirators.

177.     Also with respect to loss, AT&T has spent well in excess of $5,000 over a one year period investigating Defendants' intrusions into AT&T's information on AT&T Phones, conducting damage assessment regarding Defendants collection and dissemination of AT&T Phones with the access codes/passwords, as well as tracking down fraudulently sold Phones.

178.     Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants' access AT&T's information contained on protected computers.

179.     Defendants' activities in accessing, or facilitating access to AT&T Phones without authorization and accessing the proprietary AT&T Software therein constitutes unlawfully obtaining information from a protected computer in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

180.     Defendants' conduct is intentional, malicious and willful.

181.     Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT TWELVE

### NEW JERSEY COMPUTER FRAUD AND ABUSE ACT
### N.J. Rev. Stat. § 2A:38A-1, *et seq*.

182.     AT&T reasserts the allegations set forth in Paragraphs 1 through 181 above and Exhibits 1 through 6 as though fully set forth herein.

183.     AT&T restricts access AT&T Phones containing AT&T Software by requiring confidential codes/passwords to unlock the AT&T Phones.

184.     The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks.  Except in in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period except in specific circumstances that are not applicable here.  Inputting the unlawfully obtained unlocking code of an AT&T Phone provides unauthorized access to the Phone and proprietary AT&T Software.

185.     Upon information and belief, Defendants purposefully use, or cause others to use unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on other wireless networks.  This access is not authorized in any way.

186.     Defendants' purposeful and unauthorized access, or facilitation thereof, to AT&T Phones causes damage by collecting and disseminating unlocked Phones and unlocking codes/passwords, forcing AT&T to incur losses by assessing unlocked AT&T Phones for damage, tracking down fraudulently sold Phones, and discovering Defendants' identity and/or the method by which Defendants access AT&T's information contained on protected computers.

187.     AT&T has suffered damages for which there is no adequate remedy at law.  If the Defendant's activities are not enjoined, AT&T will continue to suffer irreparable harm and injury to their protected computers as well as their goodwill and reputation.  An award of injunctive relief would provide a benefit to AT&T and a detriment to Defendants in excess of $75,000.  In addition, pursuant to statute, AT&T is entitled to an award of compensatory and punitive damages, attorneys' fees and costs, and investigation costs.

## COUNT THIRTEEN

### CIRCUMVENTION OF PROPRIETARY SOFTWARE PROTECTION SYSTEM
### 17 U.S.C. § 1201(a)(1)

188.     AT&T reasserts the allegations set forth in Paragraphs 1 through 187 above and Exhibits 1 through 6 as though fully set forth herein.

189.     The AT&T Phones contain a SIM Lock, a technological measure that in the ordinary course of the measures' operation requires the application of information, or a process or a treatment, with AT&T's authority, to gain access to the proprietary AT&T Software, as set forth in 17 U.S.C. § 1201.

190.     The SIM Lock is a technological measure that effectively controls access to the proprietary AT&T Software.

191.     AT&T did not give Defendants or their co-conspirators authority to unlock, or otherwise to avoid, bypass, remove, disable, deactivate, or impair the technological measures for effectively controlling access to and operation of the AT&T Software.

192.     AT&T did not grant Defendants or their co-conspirators the authority to circumvent the technological measures for effectively controlling access to the AT&T Software.

193.     Defendants are in possession of unlocking codes that avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock that effectively controls access to the

proprietary AT&T Software.  Inputting the unlocking code of an AT&T Phone sold by Defendants provides unauthorized access to the proprietary AT&T Software.

194.    Defendants acted, and/or knowingly engaged in a conspiracy, to avoid, bypass, remove, disable, deactivate, or impair a technological measure for effectively controlling access to the proprietary software without AT&T's authority.

195.    Defendants engaged in this misconduct so that their co-conspirators could resell the altered devices in bulk for a profit, and not for the sole purpose of lawfully connecting to a wireless telephone communication network.

196.    Defendants acted to, and/or knowingly engaged in a conspiracy designed to, circumvent a technological measure that effectively controls access to the AT&T Software that is protected under title 17 of the United States Code, and thereby violated 17 U.S.C. § 1201.

197.    Defendants' or their co-conspirators' conduct does not fall within any of the exemptions to 17 U.S.C. § 1201.

198.     Defendants' conduct has caused and, unless enjoined, will continue to cause AT&T severe, immediate, and irreparable injury and damages for which AT&T has no  adequate remedy at law.  AT&T is entitled to injunctive relief restraining such conduct, an award of actual or statutory damages, as well as other equitable and legal relief.

### COUNT FOURTEEN

### TRAFFICKING IN CIRCUMVENTION TECHNOLOGY
### 17 U.S.C. §§ 1201(a)(2), (b)(1)

199.    AT&T reasserts the allegations set forth in Paragraphs 1 through 198 above and Exhibits 1 through 6 as though fully set forth herein.

200.    Defendants are in possession of unlocking codes that avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock technological measure within the AT&T

Phones that effectively controls access to the proprietary AT&T Software. Inputting the unlawfully obtained unlocking code of a AT&T Phone sold by Defendants provides unauthorized access to the proprietary AT&T Software within the AT&T Phone.

201.    Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that protects the AT&T Software from unauthorized access by knowingly transferring to members of the public unlocking codes for AT&T Phones sold by Defendants.

202.    Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that effectively controls access to AT&T Software by offering to the public its alteration service for a fee.

203.    Defendants' conduct does not fall within any of the exemptions.

204.    The service provided by Defendants is primarily designed or produced for the purpose of circumventing AT&T's SIM Lock technological measure that effectively controls access to AT&T Software that is protected under title 17 of the United States Code.

205.    The service provided by Defendants has, at most, only a limited commercially significant purpose or use other than circumventing AT&T's SIM Lock technological measure that effectively control access to AT&T Software that is protected under title 17 of the United States Code.

206.    Defendants have violated, and continue to violate, Section 1201 of the Copyright Act, for which AT&T has no adequate remedy at law. As a result, AT&T has been irreparably injured by Defendants' conduct and will continue to be irreparably injured unless the violating activities of Defendants are enjoined by this Court.

## COUNT FIFTEEN

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS

207.     AT&T reasserts the allegations set forth in Paragraphs 1 through 206 above and Exhibits 1 through 6 as though fully set forth herein.

208.     A business relationship, and an expectancy of business relationships, exists between AT&T and Authorized Dealers and National Retailers of AT&T Phones.

209.     A business relationship, and an expectancy of business relationships, exists between AT&T and current and prospective AT&T customers.

210.     There is a reasonable likelihood that the abovementioned prospective business relationships would occur but for the unjustified interference of Defendants and/or their co-conspirators.

211.     There is a high probability of future economic benefit to AT&T as a result of these current and prospective business relationships.

212.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between AT&T, Authorized Dealers and National Retailers who sell AT&T products, and legitimate AT&T customers or prospective customers.

213.     Specifically, but without limitation, Defendants knew that AT&T has business relationships, and an expectancy of business relationships, with legitimate consumers of AT&T Phones and wireless service.  Defendants interfered with these relationships by engaging in the Prepaid Phone Trafficking Conspiracy and diverting sales of AT&T Phones from legitimate customers intending to activate the phones on AT&T Authorized Networks.

214.    Defendants also knew that AT&T has business relationships with Authorized Dealers and National Retailers of AT&T Phones to provide them with sufficient quantities of Phones for their legitimate consumers' use exclusively on AT&T Authorized Networks. Defendants' Prepaid Phone Trafficking Conspiracy has resulted in substantial numbers of AT&T Phones that are never activated on AT&T service, thereby substantially harming AT&T and its relationship with its Authorized Dealers and National Retailers.

215.    Defendants also knew that AT&T has business relationships with legitimate AT&T customers to provide them with Phones and service on AT&T Authorized Networks.

216.    Defendants are intentionally and unjustifiably interfering with AT&T's current and prospective business relationships through improper means including fraudulent statements and misrepresentations and stealing legitimate customer purchases, as set forth in detail above, and in violation of the law as set forth in other Counts.  Defendants engaged in the acts of interference.

217.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business relationships and contracts between AT&T, and its Authorized Dealers, National Retailers and legitimate AT&T customers.

218.    Defendants' acts injured AT&T's business relationships.

219.    AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' interference.

220.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT SIXTEEN

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

221.    AT&T reasserts the allegations set forth in Paragraphs 1 through 220 above and Exhibits 1 through 6 as though fully set forth herein.

222.    A contractual relationship for a specific term exists between AT&T and Authorized Dealers and National Retailers of AT&T Phones.

223.    A contractual relationship exists between AT&T and its customers, the purchasers of its AT&T Phones and wireless service.

224.    Defendants knew that AT&T has contractual relationships with legitimate consumers of AT&T Phones and wireless service.  Defendants interfered with these relationships by, *inter alia*, inducing purchasers of AT&T products to breach their contracts with AT&T.

225.    Defendants also knew that AT&T has contractual relationships with Authorized Dealers and National Retailers of AT&T Phones under which these Authorized Dealers and National Retailers will promote and sell AT&T products solely for activation on the AT&T Authorized Networks.  On information and belief, Defendants and/or their co-conspirators induce AT&T Authorized Dealers and National Retailers to breach their agreements with AT&T and provide new AT&T Phones to Defendants for a purpose other than activation on AT&T Authorized Networks and at a financial loss to AT&T.

226.    Defendants also knew that AT&T has business relationships with legitimate AT&T customers to provide them with Phones and service on AT&T Authorized Networks.

227.    Defendants are intentionally and unjustifiably interfering with AT&T's existing contracts through improper means including fraudulent statements and misrepresentations and

stealing legitimate customer purchases, as set forth in detail above, and in violation of the law as set forth in other Counts.  Defendants engaged in the acts of interference.

228.    Defendants engaged in the acts of interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct.

229.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these existing contracts between AT&T, and its Authorized Dealers and National Retailers and legitimate AT&T customers.

230.    Defendants' acts injured AT&T's existing contractual relationships.

231.    AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' interference.

232.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT SEVENTEEN

### UNJUST ENRICHMENT

233.    AT&T reasserts the allegations set forth in Paragraphs 1 through 232 above and Exhibits 1 through 6 as though fully set forth herein.

234.    By obtaining and reselling AT&T Phones at less than AT&T's purchase cost of the Phones for use on wireless networks other than AT&T Authorized Networks, directly and through their co-conspirators, Defendants have obtained benefits in excess of $75,000 from AT&T which have caused significant harm to AT&T and resulted in significant financial gain to Defendants through their resale of the illicitly-acquired new AT&T Phones.

235.    Defendants have knowingly and voluntarily obtained the benefits.

236.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying AT&T the value of the benefits Defendants acquired.

## COUNT EIGHTEEN

### CONVERSION

237.    AT&T reasserts the allegations set forth in Paragraphs 1 through 236 above and Exhibits 1 through 6 as though fully set forth herein.

238.    Defendants have and are engaged in acts of conversion in violation of the law of the State of New Jersey.

239.    AT&T has the right to provide its Phones and wireless service to the public. Defendants have no such privilege or right.

240.    Defendants knew or should have known that they obtained the Phones through illegitimate means and had no legal right to advertise, use or resell them.

241.    Defendants are wrongfully interfering with AT&T's rights to provide AT&T Phones and wireless service by engaging in the Prepaid Phone Trafficking Conspiracy.

242.    Defendants intentionally and willfully exerted dominion and ownership over the AT&T Phones.

243.    AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' conversion of AT&T's property.

244.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## DEMAND FOR JURY TRIAL

AT&T demands a trial by jury on all triable issues.

WHEREFORE, Plaintiffs Cricket Wireless LLC, AT&T Mobility LLC, and AT&T Intellectual Property II, L.P., respectfully request that this Court enter final judgment and permanent injunctive relief in favor of the Plaintiffs and against Defendants, as follows:

(a)  awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b)  awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

(c)  granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

(d)  requiring Defendants, pursuant to the Lanham Act to deliver to Plaintiffs their entire inventory of phones and products bearing or infringing the AT&T Marks, a confusingly similar copy thereof; and

(e)  granting such further relief as this Court deems just and proper.

Respectfully submitted this 29th day of August, 2018.

By:  */s/ David V. Mignardi*


Raymond O. Aghaian (CA Bar No. 218294)
Byron R. Chin (CA Bar No. 259846)
*Pro hac vice applications forthcoming*
KILPATRICK TOWNSEND & STOCKTON LLP
9720 Wilshire Blvd PH
Beverly Hills, CA 90212-2018
Telephone:  (310) 248-3830
Facsimile:  (310) 860-0363
Email: raghaian@kilpatricktownsend.com
         bchin@kilpatricktownsend.com

Jonathan E. Polonsky (NY Bar No. 1892710)
*Pro hac vice application forthcoming*
David V. Mignardi (NJ Bar No. 035052010)
KILPATRICK TOWNSEND & STOCKTON LLP
The Grace Building 1114 Avenue of the Americas
New York, New York USA 10036
Telephone: (215) 775-8786
Facsimile: (212) 214-0341
Email: jpolonsky@kilpatricktownsend.com
         dmignardi@kilpatricktownsend.com

Michael J. Breslin (GA Bar No. 142551)
*Pro hac vice application forthcoming*
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: mbreslin@kilpatricktownsend.com

*Attorneys for Plaintiffs*